| | |
|---|---|
| In the Matter of an Arbitration Between ) | |
| ) | |
| San Jose Mercury News ) | Arbitrator's |
| ) | Opinion |
| And ) | And |
| ) | Award |
| Northern California Media Workers Union ) | |
| (Typographical Sector) ) | |
| ) | |
| Re: Digital Ad Team ) | |

**BEFORE**

Donald H. Wollett

**APPEARANCES**

**FOR THE UNION**

Duane Beeson, Esq.
Beeson, Tayer & Bodine
1404 Franklin Street, 5th Floor
Oakland, CA 94612-3210

**FOR THE EMPLOYER**

Andrew Huntington, Esq.
General Counsel and Director of Labor Relations
750 Ridder Park Drive
San Jose, CA 95190

December 29, 2006

# INTRODUCTION

This case came on for three hearings in mid 2006. Briefs were received in November. There are four grievances, each involving the performance of work by Digital Art Team employees (non-union) which the union asserts should have been done by unionized composing room employees in the bargaining unit.

The union formulates the issue as follows: "Should work tasks involved in preparing display advertisements to be published in the San Jose Mercury News have been assigned to employees in the composing room?"

The employer has a different formulation. It makes reference to each of the four grievances and says that the only issue is cropping and color corrections. The union, in its view, waived the claim to a broader issue.

The parties agreed that the arbitrator has authority to formulate the issue in light of the evidence developed in the record.

The contractual language in dispute is found in Appendix E, Paragraph (l) which

reads as follows: "Direct entry or removal computer disks may be produced by advertisers or advertising agencies. The Employer may assign composing room employees to the Digital Ad Team to perform the processing of data. However, it is specifically understood that such work is excluded as a part of the jurisdiction of the Union."

## THE FACTS

Each of the four advertisements at issue is to be placed in the SV Home Magazine. The specifications for SV Home Magazine ads are different from the general newspaper run. Display ads are routed directly to the composing room for ad production that may involve manual paste-up, routing, proofing, and customer interactions.

In 1997 the San Jose Mercury formed a department with the name DAT (Digital Ad Team). Its function was to receive electronically transmitted "camera-ready" display ads, and assure they were compatible with the San Jose Mercury News pagination system established by "flight check" of the ad. The first employee in DAT was Gianna Tabuena-Frolli. DAT has grown. Today there are 17 employees.

Historically, composing room work has involved putting together elements of the newspaper, with duties that included typesetting, paste-up, pagination, and proofing. Display ads, accompanied by a ticket were routed through the ad services department and/or received by composing room employees from sales representatives. With the

advent of new technologies such as those that allowed customers or their ad agencies to submit "camera ready" ads, composing work declined and the composing room primarily handled display advertisements that were not "camera ready."

Electronically submitted display advertisements were sent from DAT to a composing room employee who handled pagination. With the advent of the Acura software, checking display ads for compatibility no longer required human intervention and now went directly from DAT to pagination. SV Home Magazine was one of the exceptions as it continued to be manually pasted-up and handled by the composing room. The flow of display ads from a range of smaller and larger advertisers increased. Over time DAT appeared to increase the scope of its duties to include technical assistance to customers and commercial work. DAT eventually added 17 members to its staff.

In 1998 then union president, Charles Tobias, asked for a demonstration of DAT to clarify the scope of the new department's duties. He met with Gianna Tabuena-Frolli of DAT and John Hammett, the director of labor relations. Tobias was assured that DAT handled "camera ready" ads only and did not perform additional manipulations of ads other than what was called "color work." This additional duty was assumed by DAT because the department that handled color work in the past had been split up between editorial and advertising. The latter had been assigned to DAT. Tobias appeared to be satisfied that there was no incursion into composing room work.

The union proposed that DAT's single employee be part of its unit. This idea was rejected by the employer. In collective bargaining negotiations the union wanted DAT employees to be represented by the typographer's union. The employer did not agree. The union requested that composing room employees be allowed to work within DAT.

3

The employer said that composing room employees might work within DAT, but this work would be non-union work. The union accepted this. See Appendix E (1). The union claims that this agreement was based on what it was told by Gianna during the 1998 demonstration, which was that the only role DAT played was to "flight check" to ensure that "camera ready" ads were compatible with pagination.

DAT's duties described by the employer involve "checking" for corrupted files, color work, and changing PDF files to EPS files. As employees were added, up to 17, and with the availability of new technology Gianna developed procedures and publicized to others what DAT offered. This apparently did not include sending this information directly to the union or composing room employees.

Over time, the union expressed concerns about the scope of DAT's duties as DAT's more exclusive access to technologies, including software not available within the composing room, allowed DAT to make changes or corrections " more effectively". This included e.g., such things as changing an ad size or changing the resolution of an ad. DAT also cropped the white space from display ads that were transmitted electronically to DAT and then sent directly by DAT to the CCI pagination system, rather than to a composing room employee as in the past.

From the union's perspective, these practices represented incursions into the already declining composing room work which, again, has always been to put together various newspaper elements. In recent years this primarily involved display ads. The union also questioned whether ads called "camera ready" by DAT, were properly so characterized.

The union filed four grievances in April 2005 based on what it saw as an incursion by DAT into composing room work. The four grievances involved a specific product, SV

4

Home Magazine. Unlike the general newspaper run, SV Home magazine cannot automatically be placed in the CCI pagination system by DAT. The specifications for SV Home Magazine's are different from the general newspaper run. Display ads are to be routed directly to the composing room for ad production that involves manual paste-up, routing, proofing, and customer interactions. The four grievances involved display ads slated for SV Home Magazine: Scandia Downs, Ethan Allen, Design Affairs, Chong Hing Jewelers.

The employer and the union were unable to agree on the scope of the arbitration and asked the arbitrator to formulate scope in making his decision. The union asked the arbitrator to decide whether a decision would be based broadly on the respective jurisdictions of the union's composing room employees and the non-union Digital Ad Team (DAT). The employer asked that the arbitrator limit the scope of the grievance to the four advertisements on a case-by-case basis based on two issues. (1) whether DAT is entitled to crop display ads received electronically and (2) whether the work involved in color adjustments of display ads is within the exclusive jurisdiction of the union.

## THE FOUR GRIEVANCES

(1) <u>Ethan Allen</u> – It was sent from DAT to the composing room "cropped, cut to size". The union claims that cropping advertisements is traditional ad production work that belongs in the composing room. The employer argues that DAT by practice always crops unnecessary white space.

(2)  <u>Scandia Downs</u> – What happened here was that resolution (dots per square inch) was changed by DAT. The union claims that this is the province of the composing room as part of ad production work; What happened here was that a DAT employee communicated directly with the advertiser and requested a higher resolution picture, then replaced the original with a new image. The union claims this is ad production work that belongs in the composing room.

(3)  <u>Design Affairs</u> – In this instance, a color correction change was made by DAT. The change made by DAT concerned the darkness of an image, an objection raised by a customer on the basis of a proof which it had received from DAT. The union claimed this is work done on ad production and therefore was composing room work.

(4)  <u>Chong Hing Jewelers</u> – In this instance, DAT removed white space with crop marks and sent it on to the composing room. DAT removed white space and crop marks and sent the ad on to the composing room. The employer claims that this ad was "camera ready" and required no special handling. The union argues that there was special handling involved to wit the sizing and cropping of the ad. It argues that that was composing room work.

The common denominator in each of these four cases is that there was work left to be done on the ads after their arrival in DAT. The work that was done was to prepare

these ads for platemaking and, finally, the press.

## DISCUSSION

The Employer relies heavily on Appendix E, paragraph (l) which reads: " Direct entry or removal of computer disks may be produced by advertisers or advertising agencies. The Employer may assign composing room employers to the Digital Ad Team to perform the processing of data. However, it is specifically understood that such work is excluded as a part of the jurisdiction of the union."

The employer characterizes this language as clear and unambiguous. This is a familiar claim in the grievance arbitration world – a claim that the words are susceptible to no meaning other than one urged by the party making the claim. Every arbitrator, including this one, has had cases, where both parties were represented by able and experienced counsel who argued that the language at issue is clear and unambiguous. They took diametrically opposed conclusions about meaning. The "words spoke for themselves," but they spoke in very different ways.

Appendix E, Section (l) is not clear <u>and</u> unambiguous. At least the words are not clear and unambiguous to me. They cry for interpretation. I will look to history and practice to clear my head. My history with these parties goes back at least 25 years dealing with the process of converting from the hot metal method of printing to the cold type process, using photocomposition equipment and computer technology. The basic

question always is: What is the balance between the employer's concern with efficiency and "growing the business" and the union's concern over the welfare of the people it represents.

The evidence of practice is that conventional composing room work involves building, correcting, and preparing display advertisements for platemaking. To give the ambiguous language in question the broad impact that the employer urges has would be an inappropriate reading of language which is antithetical to this history. It will take clearer language than this to produce such an impact. Cropping an ad if necessary to fit the size allotted to it on the page, communicating with a customer and/or sales representative to resolve problems of presentation, referring color correction work to be performed in-house, obtaining usable pictures from the customer if the pictures submitted with the ad are low resolution are composing room tasks.

My ruling in the four grievances is as follows:

    (1)    <u>Ethan Allen</u> – Cropping an advertisement is ad production work that belongs in the composing room;

    (2)    <u>Scandia Downs</u> – Changing the resolution of an image is part of the ad production process and belongs in the composing room;

    (3)    <u>Design Affairs</u> – Color correction concern the darkness of an image is composing room work;

(4)    <u>Chong Hing Jeweler</u> – Sizing and cropping an ad is composing room work.

The common denominator in these cases is that there was work left to be done on the ads after their arrival in DAT. The work that was done was to prepare these ads for platemaking and the press. This work is traditionally composing room work and should be done there.

The employer also argues as an additional ground for dismissing the broad issues presented by the grievances that the union was guilty of waiver in failing to pursue them on a timely and responsive basis. I disagree.

Conventional wisdom favors the arbitration of grievances. The party that urges non-arbitrability has the burden of proof. In my view, the employer has not sustained its burden in this case, primarily because it failed to demonstrate how it was prejudiced.

I understand the employer's annoyance at the way in which the union handled these grievances. One might fairly say that the union was discourteous. Nonetheless, and here I repeat myself, I am unable to find a waiver because I cannot identify any harm done to the employer's ability to process these grievances by the union's behavior (other than annoyance).

One final point. Although there is little evidence in these cases to support it, I would guess that electronic submissions of display ads have shown an exponential increase in recent years. Display ads come from a range of sources representing a range of customer skills. DAT may receive increasing numbers of electronically submitted ads that are not likely to be camera ready. If this is true, these issues are likely to come up again in ways

9

which are not predictable. These are matters for the bargaining table.

## AWARD

The Employer will cease and desist from activity including cropping, changing picture resolution, manipulation of ad content upon communications with advertisers on all display ads to be published in the SV Home Magazine.

_(Signed) Donald H. Wollett_     _Dec 18, 2006_
(Signed) Donald H. Wollett            (Date)

10